UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SARAH NETTER and RACHEL HSIEH | * | No. 2:22-cv-3735 |
| | * | |
| versus | * | JUDGE _____ |
| | * | |
| UNION HOME MORTGAGE CORPORATION | * | MAGISTRATE _____ |

## COMPLAINT

NOW INTO COURT, through undersigned counsel, come Plaintiffs, SARAH NETTER and RACHEL HSIEH, who now respectfully aver as follows:

**PARTIES**

**1.**

Plaintiff, Sarah Netter, ("Netter") is a person of full age of majority and resident of the Parish of Orleans, State of Louisiana. Netter attempted to secure credit from Defendant Union Home Mortgage Corporation but was denied for discriminatory reasons.

**2.**

Plaintiff, Rachel Hsieh, ("Hsieh") is a person of full age of majority and resident of the Parish of Orleans, State of Louisiana. Hsieh attempted to secure credit from Defendant Union Home Mortgage Corporation but was denied for discriminatory reasons.

**3.**

Made defendant herein is Union Home Mortgage Corporation, ("UHMC"), an Ohio Corporation with its principal place of business in Strongsville, Ohio, who is responsible for Netter's and Hsieh damages, as alleged more fully herein.

1

## JURISDICTION

**4.**

This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. §1331 because the claims alleged herein arise under the constitution and laws of the United States.

**5.**

This Court has personal jurisdiction over UHMC as UHMC has several offices within this state and conducts business within this state, making UHMC subject to the jurisdiction of this Court.

## VENUE

**6.**

Venue is proper within this district pursuant to 28 U.S.C. §1391(b)(2) because all of the events giving rise to the claims asserted herein occurred within this judicial district.

## FACTS

**7.**

Netter and Hsieh are a married couple living in New Orleans. Netter is a self-employed writer/producer and Hsieh is a cellist with the Louisiana Philharmonic Orchestra. Netter is white and Hsieh is Asian. Netter and Hsieh were looking to buy a house and wanted to know how much of a mortgage they could get approved for. They contacted Julie Hebert ("Hebert") at UHMC, who initially told Netter over the phone that they would qualify for a mortgage of approximately $425,000, though they decided that they didn't want to take a mortgage for that full amount.

**8.**

Their search led them to put in an offer for the home located at 5301 St. Bernard Ave., New Orleans, LA 70122, (the "home"). Netter and Hsieh contacted Union Home Mortgage Corporation ("UHMC") for financing.

**9.**

Netter and Hsieh reported on their loan application combined monthly income of $7,351.16. They reported liquid assets of $318,000.00 and immovable property valued at $250,000.00, for total assets of $568,000.00. Their reported liabilities were only $9,468.00, which came largely from a one-time purchase of their wedding rings and other temporary credit card debt for that month – however, Netter and Hsieh pay off their credit cards every single month and do not carry rolling debt. In fact, they zeroed out their credit card balances more than once while working with Hebert to show that there was no debt and they don't carry any. UHMC also did not include Hsieh's cellis/bows, insured for about $60,000, as assets even though Assurance would later on.

**10.**

Netter's and Hsieh's reported net worth to UHMC was $558,532.00. Omitted from this application was Netter's additional monthly income of $2,000.00 from a lease of residential property. Hebert told Netter that she would need to pay for an updated property assessment in order to consider the rental income, which seemed unnecessary. Hebert also repeatedly refused to consider Hsieh's 1099 income, which accounts for a significant portion of her take home pay. The

bottom line was that Netter and Hsieh were unquestionably creditworthy despite the obstacles put in place by UHMC.

11.

The purchase price for the home was $425,000.00. With closing costs and prepaid items, the full value of the sale was $442,036.41. Netter and Hsieh intended to borrow only $340,000.00, therefore making a down payment of $85,000.00. Netter and Hsieh began working with loan officer Hebert, who communicated primarily by text message. In fact, the first interaction with Hebert was via phone. Hebert initially led Netter and Hsieh to believe they were unquestionably qualified for the loan and that the process would be quick and easy. In fact, on August 8, 2020, Hebert provided preliminary numbers that Netter and Hsieh would qualify for a $440,000 loan. On August 11, Hebert asked for the lease on the residential property and told Netter, "You will be fine. Everything looks perfect."

12.

At the outset, Netter and Hsieh became suspicious because of inaccurate information Hebert marked on the loan application. First, Hebert omitted Netter's rental income from the financial section of the application. Next, Hebert misrepresented the length of time Netter and Hsieh were employed by several years. Next, Hebert reflected in the application that Hsieh would not use the home as her primary residence. Finally, Hebert noted Hsieh's ethnicity as "white" even though she never met Hsieh in person or spoken to her on the phone as she indicated on the application. Despite these errors, Hebert asked Netter and Hsieh to sign the application, stating that "everything will be corrected when you sign again at closing." Netter and Hsieh refused, preferring not to sign anything inaccurate.

13.

Netter and Hsieh then proceeded to upload supporting documentation, as Hebert requested, to the UHMC documents portal. It appears that all documents initially requested were submitted by September 1, 2020, including documents substantiating Netter's and Hsieh's income. Netter also asked Hebert about her refusal to consider Netter's rental property income on the application, to which Hebert responded, "I am not using the rental income to save you money. I don't need it for you to qualify."

14.

On September 8, 2020, Hebert checked in about the inspection and homeowner's insurance. Netter responded that they were delayed because of Labor Day and one of the (many) 2020 gulf hurricanes. Hebert asked if those documents could be provided by the following Monday, September 14, to which Netter agreed. Hebert did not mention anything about income documentation.

15.

The next day, September 15, Hebert asked if Netter and Hsieh were moving forward with the purchase of the home. Netter responded with a status report about the inspection and flood insurance, but assured Hebert that they were aiming for a "9/9 closing" (which should have said "10/9"). Hebert also asked on that date when Hsieh's pay stubs would start back up, to which Hsieh replied that the LPO season began the following week so she would expect them then.

**16.**

The following day, September 16, 2020, Netter advised Hebert that they would assume the seller's flood insurance policy and asked Hebert to send certain information to the insurance broker. Hebert complied.

**17.**

Hsieh and Netter were conditionally approved for their requested loan on September 24, 2020. Things went downhill from there.

**18.**

The next day, Netter provided a P&L letter to Hebert which appears to be a profit and loss statement from Netter's self-employment. Hebert refused to accept it, advising that the P&L statement needed to be audited. Netter questioned the auditing requirement, stating that it seemed drastic and that she'd provided considerable documents already, including tax returns, accounting reports, and a letter from her CPA. Netter also questioned how it was not evident that she and Hsieh could afford this mortgage since UHMC had access to all of Netter's banking information and brokerage accounts.

**19.**

Hebert responded that the only alternative was for Netter to provide 2 months of bank statements from her checking, savings, and brokerage accounts. Netter responded that she'd already provided that for all three accounts, but Hebert claimed these were not acceptable because they were only summary statements and not all pages of all of the statements. Hebert then reversed

course, admitting that Netter had provided those statements and they had gone to Hebert's junk email folder. Hebert then advised that everything was taken care of and the audited P&L statements were not required. During the back-and-forth, Hebert apologized, stating that these restrictions were a "nationwide guideline that has changed due to COVID" and were not UHMC's fault.

20.

Three days later, on September 28, Netter contacted Hebert and advised that the last two requested documents had been uploaded (proof of withdrawal of funds from Netter's brokerage account and deposit of those funds into checking or savings). These documents appear to have been required to show proof that Netter transferred $125,000 from her brokerage account to her checking account to cover the down payment, closing costs, and prepaid items. At first, all appeared fine. But when Netter asked about the status of their final loan approval, Hebert advised that the statement Netter had uploaded was from July and was therefore not sufficient—she needed a more recent statement. Netter responded that she had provided the most recent statement available and that "I can't make them invent a new statement." Hebert then sent Netter on a wild chase to try and prove the balance of one of Netter's deposit accounts, an account that unquestionably held over $126,000.00. Hebert asked for ridiculous things like full activity logs for several accounts with a URL address on the bottom of each account activity log. All the while, Hebert assured Netter that UHM was "relaxed compared to her competitors".

21.

Netter pointed out that Hebert had only asked for 1) Netter's August brokerage account statement, and 2) a receipt of withdrawal from the brokerage account and deposit into checking or savings, to prove the $125,000 Netter would use for the down payment and other prepaids was

7

available. Netter stated that she'd provided everything she could, because her retirement account issues statements quarterly and she provided the most recent statement. Netter offered to have her financial advisor send a letter, but pointed out that closing was only 10 days away. Hebert responded, essentially saying that she didn't know what documentation would be required when she made her request for Netter's last two documents and that she had no way of knowing what documentation would be required to prove the retirement account transfer.

22.

Netter asked Hebert for a final and complete list of documents needed for final approval of the loan. Netter advised that she was unable to provide an activity log with a "web address" at the bottom from her retirement brokerage firm. Hebert responded, accusing Netter of delaying the process and refusing to provide information, and closing with "this loan has been a struggle for sure but it shouldn't be like this." Nevertheless, Hebert still would not consider Netter's rental income or Hsieh's 1099 income even at this point.

23.

That same evening, Hebert advised that the home's appraisal was in. The next evening, September 29, Netter provided the remaining documents from her brokerage firm and worked out an activity log from Chase bank with the URL printed at the bottom.

24.

The next day, September 30, Hebert advised that the loan would be delayed by underwriting because of delays with the title company. Netter and Hsieh contacted their realtor, who worked with the title company to eliminate the delay. The title was ready that same afternoon.

**25.**

Netter and Hsieh heard nothing from Hebert on their final loan approval until almost a week later, October 6. Hebert advised then that the loan was undergoing extra review relating to Netter's and Hsieh's income. Hebert asked if Netter had any outstanding invoices and asked for an updated P&L statement. Netter advised of her increased income based on new contracts. Hebert was adamant that Netter and Hsieh update their income to include as much as possible. Hsieh questioned how they would still qualify for the loan if the underwriters wanted proof of more income.

**26.**

That same evening, Hebert responded that the underwriters initially averaged Netter's and Hsieh's 2019 and 2020 monthly income, but the supervisor overruled that decision and only allowed Netter's and Hsieh's 2020 income averaged over 8.5 months (6 of which were during the COVID pandemic). However, at that time, Hebert did not believe this would negatively affect approval of the loan. All parties were still pushing for a closing three days later.

**27.**

The next day, October 7, Hebert responded that the loan was denied because Hsieh had been furloughed and Netter's P&L statement was insufficient. Hebert stated that Hsieh's employer's HR department had sent over earnings information and it was less than expected. Hebert suggested that she get something from Hsieh's employer showing expected regular earnings going forward and using the updated P&L Netter provided to try for approval again. Hebert also sent a screenshot of what looks like a financial snapshot of Netter's and Hsieh's

application, showing liquid assets of $321,114.56, total assets of $571,194.56, total liabilities of $9,450.00, outstanding monthly payments on revolving credit accounts of $209.00, and a total net worth of $561,744.56. At this point, Netter and Hsieh did not have any credit card or other debt of any kind, which they had proven to Hebert repeatedly. Nevertheless, Hebert advised that Netter's and Hsieh's debt-to-income ratio was too high and asked for additional information about their credit card bills and income. Hebert also questioned a deposit of $1,000 from the SBA, a COVID disaster impact grant.

**28.**

Hsieh then asked if any of her freelance income could be included in the calculation. Hebert again blamed Hsieh and Netter for the delay, stating that they didn't send Netter's updated P&L statement in time, which delayed the underwriting department. Hebert then claimed she needed Netter's and Hsieh's past two years of income tax returns to establish self-employment income (even though Hebert represented at the outset that these documents wouldn't be needed); however, the only information that would be actually used to establish freelance income was P&L statements from 2020.

**29.**

It became clear to Netter and Hsieh that neither Hebert nor her supervisors understood the nature of freelance work, which (pre-COVID), always provided a reliable supplement to income. Netter and Hsieh asked for their application to be reviewed by someone else who could be more helpful. Hebert again blamed nebulous "guidelines" for all the problems with the loan. Hebert explained that new rules implemented in June 2020 only allowed prior years' tax returns to be used to prove income if they matched income from 2020 P&L statements or deposit account statements.

She also explained that rental income from other owned properties could not be used to show income, another June 2020 "guideline."

30.

Hebert then asked if any of Netter's or Hsieh's credit cards could be paid off. Netter immediately paid off a $6,700 credit card balance. Hebert seemed to represent that all was well after that. However, Netter again requested a conference call with underwriting and branch leadership to avoid the back-and-forth that had plagued the process for the past few days. Netter and Hsieh spoke to a supervisor named Candy, who assured them that she was working very hard with Hebert to close on time, but said their hands were tied in terms of documentation. Netter asked again for someone who was better versed in working with freelance or self-employed clients and they assured Netter that they both were very experienced with these types of clients.

31.

On the evening of October 7, Hebert asked for additional information about Hsieh's furlough from LPO. Hsieh provided the information immediately. Hsieh's brief furlough was a temporary reduction in her working schedule due to the COVID-19 pandemic.

32.

The next day, October 8, (one day before the scheduled closing), Hebert advised she was still waiting on a VOE (verification of employment) for Hsieh's work at LPO. When she received it, Hebert verified with Hsieh that her 2020 monthly base income was $1,540.00. There was some confusion since Hsieh's annual pay is normally based on a 36-week season, but COVID resulted in a temporary furlough such that Hsieh only worked 26 weeks that year.

33.

Hebert then advised that Hsieh and Netter no longer qualified for the loan terms as originally stated. She offered two options: 1) reduce the loan to $273,000 and require Netter and Hsieh to pay off all their credit card accounts, which they had already paid off numerous times or 2) send an undated bank statement printout showing any additional income from September 24 through October 8 for a recalculation. Hsieh and Netter balked at this proposal, noting that an extra $70,000 down payment from two women with excellent credit and steady jobs was outrageous. That same day, Hsieh and Netter advised Hebert they no longer wished to pursue credit with UHMC and asked Hebert to close their file.

34.

Netter and Hsieh then sought credit through Assurance Financial ("Assurance"). The appraisal Assurance ordered showed a $15,000 increase in the value of the home. Providing all of the same information they provided to UHMC, Netter and Hsieh were easily approved for financing with a better interest rate on the same originally desired terms and purchased the home without issue. Assurance also used without issue, Netter's rental property income and Hsieh's 1099 income, both which Hebert refused to include in their UHMC documentation.

35.

Even though they had asked UHMC to close their file, UHMC issued a credit denial on October 14, 2020. The reasons for the denial were 1) excessive obligations, 2) insufficient income for total obligations, and 3) income insufficient for the amount of credit requested. Hsieh and Netter sought an explanation why the loan process has continued to a denial and were eventually

connected with Kevin Pezzani, Senior Vice-President for Risk Management. Pezzani advised that once a file is sent to underwriting and conditionally approved, it cannot be withdrawn without a denial. He further stated that if a borrower is unable or unwilling to meet the conditions, the loan must be denied. He provided no additional information about the underlying reason for the denial, referring Netter and Hsieh to the denial letter they'd previously received.

**36.**

Netter and Hsieh feel they were discriminated against because of their sex, their marital status, and Hsieh's race. They are particularly offended by what they feel was increased scrutiny of their financial position and a pretextual reasoning behind their denial of credit. Their feelings are corroborated by an uneventful application and approval process through Assurance less than one month after everything fell apart with UHMC.

**37.**

UHMC's actions caused Netter's and Hsieh's closing date to be delayed by several weeks. Their credit denial also damaged Netter's and Hsieh's creditworthiness and financial reputation.

## COUNT 1
### VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT

### 15 U.S.C. § 1691, ET SEQ.

**38.**

Netter and Hsieh incorporate by reference paragraphs 1 through 37.

**39.**

The Equal Credit Opportunity Act prohibits a creditor from discriminating against an applicant with respect to any aspect of a credit transaction on the basis of several characteristics, including sex, race, and marital status.

**40.**

A plaintiff states a cause of action under the Equal Credit Opportunity Act by alleging four elements: (1) plaintiff was a member of a protected class; (2) plaintiff applied for credit from defendant; (3) plaintiff was qualified for the credit; and (4) despite qualification, plaintiff was denied credit.

**41.**

Netter and Hsieh are members of a protected class because they are women and are a same-sex married couple. Further, as an Asian woman, Hsieh is a member of a protected class by virtue of her race.

**42.**

Netter and Hsieh applied for credit through UHMC.

**43.**

Even though they were unquestionably qualified for credit (as evidenced by their ability to secure credit through another lender without issue), UHMC denied credit to Netter and Hsieh.

**44.**

UHMC's reasons for denying credit to Netter and Hsieh were pretextual and concealed an intent to discriminate against Netter and Hsieh based on their sex, marital status, and race.

**45.**

The Equal Credit Opportunity Act likewise requires creditors who take "adverse action" against an applicant to comply with certain procedures, including: 1) notifying the applicant of the nature of the credit decision within 30 days, 2) providing the applicant with specific written reasons for the adverse action, and 3) furnishing the applicant with any appraisals or other valuations conducted in the course of the credit application. Violation of any one of these procedures constitutes a violation of the Act.

**46.**

As a result of UHMC's conduct, Netter and Hsieh suffered emotional distress, damage to their reputations, and financial consequences that will be proven at trial.

**47.**

Netter and Hsieh are likewise entitled to actual damages to be determined by this Court, punitive damages of $10,000.00, and attorney's fees.

## COUNT 2
## VIOLATION OF THE FAIR HOUSING ACT
## 42 U.S.C. § 3601, ET SEQ.

**48.**

Netter and Hsieh incorporate by reference paragraphs 1 through 46.

**49.**

The Fair Housing Act prohibits someone who engages in "residential real estate-related transactions" from discriminating based on several characteristics, including sex, race, and marital status.

**50.**

A plaintiff under the Fair Housing Act states a cause of action by alleging four elements: (1) membership in a protected class; (2) plaintiff applied and was qualified for credit; (3) plaintiff was rejected; and (4) credit was extended to other, similarly situated applicants.

**51.**

As alleged, *supra*, Netter and Hsieh are member of protected classes, applied for credit through UHMC, and were denied credit.

**52.**

On information and belief, UHMC has extended and continues to extend credit to other borrowers with similar financial situations as Netter and Hsieh but who are not same-sex married couples.

**53.**

As a result of UHMC's conduct, Netter and Hsieh suffered emotional distress, damage to their reputations, and financial consequences that will be proven at trial.

**54.**

Netter and Hsieh are likewise entitled to punitive damages and attorney's fees.

**DAMAGES**

**55.**

As a direct result of the UHMC's actions described above, Netter and Hsieh have suffered damage in the following respects:

a. Compensatory damages for monies lost through delayed closing;
b. Compensatory damages for damage to credit history/creditworthiness;
c. Compensatory damages for damage to reputation;
d. Punitive damages;
e. Attorney's fees; and
f. Other measures and elements of damages that may be proven at trial.

**56.**

UHMC is liable to Netter and Hsieh for the damages described above in an amount to be determined by this Court.

**WHEREFORE**, premises considered, Plaintiffs, SARAH NETTER and RACHEL HSIEH, pray for judgment in their favor and against Defendant, UNION HOME MORTGAGE CORPORATION, in such amounts as are reasonable within the premises, and for all other general and equitable relief, and, in addition, for whatever penalties, attorney's fees, and costs as allowed by law, together with judicial interest thereon from date of judicial demand until paid.

**[SIGNATURE BLOCK ON NEXT PAGE]**

Respectfully Submitted:

  /s/ Jeigh L. Britton
JEIGH L. BRITTON  (La. Bar. No. 39820)
EVAN J. BERGERON (La. Bar. No. 33725)
WINSTON BERGERON, LLP
1700 Josephine Street
New Orleans, LA 70113
Telephone: 504-577-2500
Facsimile: 504-577-2562
Email: jeigh@winstonbergeron.com
evan@winstonbergeron.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF ELECTRONIC FILING

I hereby certify that on October 6, 2022, a copy of the forgoing Complaint was filed electronically with the Clerk of Court using the CM/ECF system.

All counsel will be served through the CM/ECF system. There are no non-CM/ECF participants.

 /s/ Jeigh L. Britton
JEIGH L. BRITTON (La. Bar. No. 39820)
WINSTON BERGERON, LLP
1700 Josephine Street
New Orleans, LA 70113
Telephone: 504-577-2500
Facsimile: 504-577-2562
Email: evan@winstonbergeron.com